UNITED STATES of America, Plaintiff,

v.

Salvatore BONANNO and Joseph C. Bonanno, Jr., Defendants.

No. CR–71–110 RFP (SJ).

United States District Court, N. D. California.

May 17, 1978.

Edmund D. Lyons, Jr., Asst. U. S. Atty., San Francisco, Cal., for plaintiff United States.

Jerrold M. Ladar, San Francisco, Cal., Albert J. Krieger, Joseph Beeler, Miami, Fla., for defendants Salvatore and Joseph Bonanno, Jr.

## OPINION

PECKHAM, Chief Judge.

On February 15, 1972, defendants Salvatore V. Bonanno and Joseph C. Bonanno were convicted of using extortionate means to collect credit in violation of 18 U.S.C. § 894, conspiracy in violation of 18 U.S.C. § 371, and being principals to a crime in violation of 18 U.S.C. § 2. Salvatore was sentenced to three years imprisonment, to run concurrently with an unrelated federal term of imprisonment he was then serving, and was also given a ten-year suspended sentence of imprisonment and placed on probation for five years. This probationary period commenced upon his release from prison in March, 1974. Joseph was sentenced to concurrent terms of five years imprisonment on four counts, and began serving his sentence on August 17, 1973. After 26 months in prison, this court granted Joseph's motion under 28 U.S.C. § 2255, and vacated his sentence on the grounds that the United States Board of Parole had not given the defendant the early parole consideration intended by the court when it imposed sentence under 18 U.S.C. § 4208(a)(2).[1] Therefore, on October 22, 1975, this court resentenced Joseph to five years probation.[2]

Both Salvatore and Joseph Bonanno were on probation to this court in February, 1978, when the probation office accused them of violating several conditions of their probation.[3] Salvatore is charged with nine

---

1. Now 18 U.S.C. § 4205(b)(2).

2. After the commencement of these probation revocation proceedings, the Ninth Circuit vacated the 1975 order of this court resentencing Joseph Bonanno to probation. *Joseph C. Bonanno v. United States*, 571 F.2d 588 (1978) (Memorandum Opinion). The Ninth Circuit held that in light of *Andrino v. United States*, 550 F.2d 519 (9th Cir. 1977) decided after the order of this court had been appealed, this court lacked jurisdiction over defendant Joseph Bonanno's motion under § 2255. The proper remedy for Joseph would have been a habeas corpus petition under 28 U.S.C. § 2241, brought in the district in which there was jurisdiction over the prisoner or his custodian, the Central District of California.

Realizing that his status as a probationer before this court may not be finally resolved because the mandate from the Ninth Circuit has not yet reached this court, Joseph nonetheless participated fully in this revocation proceeding as if he were under a valid sentence of probation. This court will herein make factual findings as to the allegations against Joseph, and will make a final decision effecting Joseph's probationary status.

3. The standard conditions of probation, which were imposed by the court, are:

"(1) You shall refrain from violation of any law (federal, state, and local). You shall get in

violations and Joseph with four. The allegations against Salvatore are:

1. On or about January 30, 1978, the defendant allegedly threatened Mickey Ferrara [sic], because of a dispute in Los Gatos, California.

2. Phil Bell, a convicted felon, was seen in the company of the defendant on a number of occasions in 1976 and 1977 in Santa Clara and Los Gatos, California.

3. On July 10, 1974, the defendant was seen in the company of Pete Tenner, a convicted felon, at the Sportsmens Lounge in Los Angeles, California.

4. On or about July 11, 1974, the defendant was seen in the company of Pete Tenner and Joe Sica, both convicted felons, at the Sportsmens Lounge in Los Angeles.

5. In March, 1976, the defendant met with Frank Sacco, an at-large prison escapee and convicted felon, in Renzo's Restaurant in San Jose, California.

6. Michael Dorn, a convicted felon, was observed on at least two occasions in the defendant's presence in 1976 in Santa Clara, California.

[4] 7. It is alleged the defendant provided false information to the Probation Officer regarding his whereabouts on February 3, 1978.

[4] 8. On three monthly report forms the defendant provided a misleading telephone number. He denied any knowledge of the number when questioned by the Probation Officer.

9. The defendant has failed to accurately fill out his monthly report forms regarding income, even though told to do so by his attorney in the presence of the Probation Officer.

The allegations against Joseph are:

1. On or about January 30, 1978, the defendant allegedly threatened Mickey Ferrara [sic] because of a dispute in Los Gatos, California.

2. Phil Bell, a convicted felon, was seen in the company of the defendant on a number of occasions in 1976 and 1977 in Santa Clara and Los Gatos, California.

3. Michael Dorn, a convicted felon, was observed on at least two occasions in the defendant's presence in 1976 in Santa Clara, California.

4. The defendant has failed to accurately fill out his monthly report forms regarding income.

■ The first question before this court is "whether [each probationer] has in fact acted in violation of one or more conditions of his [probation]. Only if it is determined that the [probationer] did violate the conditions does [a] second question arise: should the [probationer] be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation." *Morrissey v. Brewer*, 408 U.S. 471, 479–80, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972), *quoted in Gagnon v. Scarpelli*, 411 U.S. 778, 784, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

■ The court has considerable discretion in revoking probation. *Burns v. United States*, 287 U.S. 216, 221, 53 S.Ct. 154, 77 L.Ed. 266 (1932); *Gagnon v. Scarpelli*, *supra*; *United States v. Dane*, 570 F.2d 840, 845 (9th Cir. 1977). *See also United States*

touch immediately with your probation officer if arrested or questioned by a law-enforcement officer.

(2) You shall associate only with law-abiding persons and maintain reasonable hours.

(3) You shall work regularly at a lawful occupation and support your legal dependents, if any, to the best of your ability. When out of work you shall notify your probation officer at once. You shall consult him prior to job changes.

(4) You shall not leave the judicial district without permission of the probation officer.

(5) You shall notify your probation officer immediately of any change in your place of residence.

(6) You shall follow the probation officer's instructions.

(7) You shall report to the probation officer as directed."

4. These allegations were dismissed by the government during the hearing.

*v. Consuelo-Gonzales,* 521 F.2d 259 (9th Cir. 1975) (en banc). The standard of proof applied to the initial question of whether there has been a violation of a condition of probation has been best stated as follows:

A revocation of probation is an exercise of broad discretionary power by the trial court akin to that utilized in imposing the probated sentence initially. Evidence that would establish guilt beyond a reasonable doubt is not required to support an order revoking probation. Probably evidence rising to the level of substantial evidence is not even required, absent arbitrary and capricious action in the revocation. All that is required is that the evidence and facts be such as to reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation.

*United States v. Francischine,* 512 F.2d 827, 829 (5th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 284, 46 L.Ed.2d 261 (1975). Thus, in evaluating the evidence to determine if there has been a violation of one or more of the conditions of probation, this court must be "reasonably satisfied" that a violation has occurred. *See also United States v. Manuszak,* 532 F.2d 311 (3rd Cir. 1976) (citing cases); *United States v. Carrion,* 457 F.2d 808, 809 (9th Cir. 1972), *cited approvingly in United States v. Lustig,* 555 F.2d 751, 753 (9th Cir. 1977); *United States v. Marron,* 564 F.2d 867, 871 (9th Cir. 1977).

■ The probation revocation hearing in this case was unusually lengthy. There were six full days of testimony, and counsel for the probationers were given extensive opportunity to cross-examine the government's witnesses. Having considered carefully all of the evidence, and for the reasons stated below, the court finds that both Salvatore and Joseph Bonanno violated their conditions of probation. Since this court finds that the probationers have violated certain conditions of probation, a written statement must issue as to the evidence relied on and the reasons for revocation. *Morrissey v. Brewer, supra,* 408 U.S. at 489, 92 S.Ct. 2593; *cited in Gagnon v. Scarpelli, supra,* 411 U.S. at 786, 93 S.Ct. 1756.

The legal and factual issues raised by the allegations against both Joseph and Salvatore have been divided into three categories for the purposes of this opinion: (1) the alleged threat to Michael (Mickey) Ferreira (allegation No. 1 against each); (2) the alleged associations with persons who are not "law-abiding" (allegations Nos. 2–6 against Salvatore and allegations Nos. 2 and 3 against Joseph); and (3) the alleged failure to report income accurately (allegation No. 9 against Salvatore and allegation No. 4 against Joseph). The court's opinion deals with the allegations in this order.

## I. THREATS AGAINST MICHAEL FERREIRA

■ The primary allegation of a violation of a condition of probation against Joseph and Salvatore Bonanno is allegation No. 1; that on January 30, 1978, they threatened Michael (Mickey) Ferreira. The court would view this violation, if proven,[5] as extremely serious because it would indicate that the Bonannos were continuing to engage in actions very similar to those for which they had been convicted in 1972, using extortionate or threatening means to collect credit.

Ferreira, a 26 year old gambler and card player who has not been steadily employed since coming to the Bay Area in 1972, is a central figure in the web of relationships surrounding this allegation, and is the government's sole witness to the alleged threats. Sometime between November,

---

**5.** Where one of the violations charged against the probationer is the violation of a state or federal law, as has been alleged against each of the Bonannos, probation may be revoked if this court is reasonably satisfied that there has been a violation of the law even if the proof would not be adequate to sustain a conviction in a criminal prosecution where the government must meet a higher burden of proof. *United States v. Carrion, supra,* 457 F.2d 808; *United States v. Lustig, supra,* 555 F.2d 751; *United States v. Marron, supra,* 564 F.2d 867. The state or federal laws which were allegedly violated were not specified but may include 18 U.S.C. § 894 and Cal.Penal Code §§ 217 (assault to commit murder), 245 (assault with force likely to produce great bodily injury), or 524 (extortion).

1976, and January, 1977, Mickey began a romantic relationship with Valerie Stark, a childhood friend of Joseph Bonanno's wife, Karen. Valerie is a "very close friend" of both Joseph and Karen, and a former employee of a Los Gatos boutique controlled by Joseph and visited daily by him. Through Valerie, Mickey became acquainted with Joseph and less closely, with Salvatore. When Mickey and Valerie were married on March 13, 1977, Joseph was the best man and Mickey testified that he felt he had assumed an obligation to both Joseph and Salvatore to "watch over" Valerie for them.

However, the marriage did not last long. Valerie testified that by the time she and Mickey separated in about July, 1977, Mickey had borrowed money from her parents and had not repaid it, had overdrawn their joint checking account, and had stolen and cashed her tax refund check. This last event resulted in her filing a criminal complaint against Mickey. Subsequently, Mickey discovered that Valerie was romantically involved with Nick Dalis, the owner of the Garden City card club where Mickey gambled and where he had cashed three bad checks totalling $500. Mickey testified that he was greatly disturbed by his wife's relationship with Dalis, and one night in September 1977 after he said he saw them kissing in the parking lot of the card club, he followed Valerie home and confronted her outside her apartment. They argued, he struck her, and she called the police.

Since their separation, there is a dispute as to whether Mickey has harassed Valerie or whether she has sought out Mickey. In any case, they met on at least two more occasions, in addition to the above described confrontation in September. Once in July or August, 1977, Valerie came to Mickey's apartment at 3:00 a. m. and he called the police. Then, in November, Mickey gave Valerie $100 at a brief meeting in a parking lot. This was apparently the last time they saw each other, although they spoke over the telephone in early December. Valerie testified that Mickey at that time told her that he would contest her attempt to get a divorce and would "get" Nick Dalis, her,

and everyone close to her unless she dropped her complaint against him for taking her tax refund check. Mickey denied having such a conversation, although he admitted at one time planning to "hurt" Dalis.

It is against this background that the court views the sequence of events beginning on January 27, 1978, and ending with the meeting on January 30 where the alleged threat was made.

On January 27, Valerie returned to the boutique temporarily to work in place of Karen. According to Valerie, Mickey called her that morning, saying "Valerie, this is Mickey. Don't hang up on me." Valerie immediately hung up the telephone and was "very shook" that Mickey had located her. They had not been in contact for more than one month but with this telephone call, she said, all her fears about him and what he might do returned. She called Joseph's office at Kachina Fashions, the parent corporation that owned the boutique, and talked with Gerald Brown, a Kachina employee. Brown came to the boutique at her insistence. While he was there, the phone rang again but the person calling hung up without speaking. Believing the call had been from Mickey, Valerie became hysterical. According to Brown's testimony, Brown then drove with Valerie to the Kachina offices where Joseph Bonanno arrived shortly thereafter.

At Kachina Fashions, Valerie was at first "too upset" to relate to Joseph what had happened, Brown said, and later she again became hysterical when she thought she saw Mickey drive by on the street. According to Brown, she told Joseph "I won't put anything past him [Mickey], I'm scared to death of him," and Joseph tried to calm her down. Valerie also testified that she had previously told Joseph and Karen about the earlier incident when Mickey struck her and about Mickey's threat to "get" her.

Mickey denied calling Valerie at the boutique on the 27th or driving past Kachina Fashions. But he testified that he received a message that same day at his parents'

home that "Joey" had called and he was to call back as soon as possible. Mickey said that he tried to return the call on that day, a Friday, and over the weekend, but did not reach Joseph until Monday morning, January 30. Joseph then invited him to come to the Kachina offices in the afternoon.

Ferreira arrived at the Kachina offices at approximately 3:00 p. m. with a friend, Kirk Speer, who was with him that day. Speer waited in the lobby while Mickey accompanied Joseph to his office, where Salvatore was waiting. Exactly what took place at this meeting is the critical question involved here. According to Mickey's testimony, Salvatore would not shake hands with Mickey when Mickey extended his hand. Salvatore "just told me to sit down and shut up . . . you're here to listen, not to have a conversation or a discussion." Mickey said that Salvatore started the conversation by saying that nothing would happen to him there: "if anything were going to happen to me, I would have my hand shook, a pat on the back, a smile, say 'good bye' and then the next time I was seen by Bill [Salvatore] or Joe or any of the people involved with them, at that time, something would happen to me . . . I would be 'blown away.'" Mickey understood "blown away" to mean that he would be killed. Mickey continued: "I was told that the reason they were upset, the reason I was there was because I was harassing Valerie." The Bonannos allegedly accused Mickey of making phone calls to her and of cruising in his car up and down in front of the boutique where Valerie was employed. When he attempted to deny these acts, Mickey said the Bonannos kept calling him a liar, and at one point they called Gerald Brown to verify their accusations.

After Brown left the room, Mickey testified, Joseph explained how harassing Valerie directly involved him:

"First of all, she was an employee; the harassing was disrupting his business; second of all, he was the best man at my wedding which made him feel sort of responsible for the relationship; as long as Valerie and I were married, he would never

say a word or interfere, but now that we were separated, and no longer together and married, that he had to interfere. He felt it was his responsibility."

"And the next one was that he had known Valerie for a long time . . . that she was very, very close . . . and he was taking it personally."

If the harassment continued, Mickey testified, Joseph said "he would personally blow my brains out if Valerie so much as—if Valerie said she received one phone call from me, if she received an anonymous phone call . . . ." Then Salvatore said "they were serious and I was to leave Valerie alone."

Another major portion of this discussion allegedly involved Nick Dalis, to whose cardroom Mickey owed $500 and who Mickey knew to be having an affair with Valerie. According to Mickey, Joseph stated that Mickey had made a mistake by getting involved with Nick Dalis, and that Dalis had put out a "contract" on Mickey's life, "primarily," Joseph said, because of the $500 debt, but also because of the relationship with Valerie. Mickey testified he himself believed that "compared to the affair with Valerie, the $500 was no big thing," and that his troubles with Dalis and the Bonannos stemmed from both issues.

Ferreira further testified that at some point during this meeting, Joseph and Salvatore wanted to speak about another matter with Kirk Speer who had been waiting in the lobby. Speer entered the room with Gerald Brown and a large individual who was visibly displaying a gun, according to Mickey. After Speer and the other two men left the room, Joseph allegedly complained that Mickey was "shooting his mouth off" about his relationship with the Bonannos, implying that he was a close friend even though their relationship was, in fact, quite casual. Finally, Mickey testified that at some point during the conversation he was told by Salvatore not to mention anything about the conversation or he would be killed.

Clearly, the key issue in the court's determination of whether the government has

met its burden of proof regarding this allegation is the credibility of Mickey Ferreira, particularly with regard to his recitation of the specific language used at the January 30th meeting. The court notes that a number of details in Ferreira's testimony are substantiated by other evidence and testimony.

That the meeting took place on January 30 at approximately the time stated by Mickey was verified by both Kirk Speer and Gerald Brown. Speer's testimony supported Mickey's account of the length of the meeting, and Mickey's statements that Speer remained in the lobby (except for brief period), that both Joseph and Salvatore were present, that also present were Gerald Brown and another person, who both described as large, that Speer was checked for weapons, that the door to Joseph's office was closed during the meeting, and that upon leaving the offices, a car driven by Gerald Brown was blocking Mickey's car from leaving the parking lot.

Gerald Brown's testimony was partially in agreement with Mickey's but he remembered the meeting as taking less time, remembered the door as being open, and he specifically recalled that no one besides Joseph, Salvatore, Mickey, Speer, and himself were present. He did not remember a large individual with a gun.

The testimony of Nick Dalis and Valerie also supported Mickey's story to some extent. Valerie stated that she knew Mickey had been "talked to" by Joseph, and although she did not remember the details or who told her, she remembered someone telling her "I don't think Mickey will be calling you, harassing you at the store anymore. . . ." Dalis admitted in his testimony that he was involved with Valerie, and stated that he knew Valerie had spoken to the Bonannos about Mickey's "pestering" her. Furthermore, he testified that sometime after January 30, Valerie had told him that Mickey would not be bothering them anymore.

However, Dalis denied Mickey's allegation that Dalis had put out a "contract" on Mickey's life. Dalis stated that he did not know Salvatore Bonanno, and had met Joseph Bonanno through Valerie at the cardroom, where they had a superficial conversation concerning Joseph's desire to purchase a Rolls Royce automobile. Dalis also testified that he knew nothing about any alleged "contract" on Mickey, that he had never put out a contract on anybody, that he did not do business that way, and that he routinely turned bad checks, 1 including Mickey's, over to a collection agency.

In the court's view, the single most important piece of evidence corroborating Ferreira's testimony is a telephone conversation on February 9, 1978, between Mickey and Joseph, which was recorded with Mickey's consent. This conversation followed a meeting, also recorded, between Mickey and Dalis in the parking lot of the Garden City cardroom, where Mickey attempted to pay part of his debt to the cardroom and asked Dalis if he had put out a "contract" on him. The most relevant portion of the telephone conversation is as follows:

MF: Listen Joe when we talked didn't you tell me we were going to be straight with each other?

JB: Yeah, why, what's the problem?

MF: I, you know, I didn't get to you this morning. I called and they said you left like five minutes.

JB: Uh huh.

MF: I called Nick and I went down and talked to him.

JB: Yeah.

MF: I told him I was here. I didn't have all of it but I got half the cash and wanted to give it to him. I wanted to give him my word I would never go near him, Valerie, the club, nothing.

JB: Yeah.

MF: He says he don't know nothing about it. He says he don't know how I should even mention your name. He says he never talked to you about it. He never heard nothing. He doesn't know nothing about, you know, as far as he was concerned, I'm a nice guy. He, you know, he has no beef with me. No

complaints. He said I'm welcome in his club. The whole shot. And I'm standing there like a fucking idiot. I was shaking in my ass.

JB: Yeah. Well let me call on that. Let me, you know, that's ridiculous.

MF: Yeah, Joe, honest to God. You know, I told you. I gave you my word, I would not fuck around and I would clean that shit up with Nick.

JB: Okay. Well let me, let me call. In fact, I've got a message right here on my desk sitting here from Nick. So I'm going to call him and find out what the hell it's all about.

The transcript, but more clearly the recording itself, confirm that Joseph and Mickey had indeed talked about Valerie, Dalis, and the money Mickey owed to the Garden City. It also seems clear that Joseph found implausible Dalis's professed ignorance of any discussions of these subjects with the Bonannos. Joseph's above-quoted statement, "that's ridiculous" is the strongest confirmation of Mickey's account of what was discussed in the January 30th meeting. But there is nothing in this or any other recorded conversation to indicate the tone or manner in which these matters were discussed or whether threatening language was used. On the other hand, Mickey testified that even before these recorded conversations took place, he believed that the Bonannos and Dalis knew that he had been talking with the police, and said that the Bonannos had warned him about this on January 30th. This knowledge may have made Joseph and Dalis more circumspect when they talked with Mickey on February 9, but even construing the recorded conversations most favorably to Mickey's version, there are at best only implicit references to the subject discussed at the January 30th meeting.

In sum, Ferreira's testimony is substantiated by other evidence with regard to a number of supporting details. There is no question but that Joseph, Salvatore and Mickey met on January 30th at the Kachina Fashions offices. We can also reasonably conclude that Valerie and Dalis were discussed at that meeting and that Mickey was warned to stay away from Valerie and stop harassing her. But the crucial language constituting the threat to Mickey's life was testified to only by Mickey. If the court does not believe his recitation of the conversation at the meeting, if Mickey distorted and embellished the statements made at that meeting, the essence of the allegation against the Bonannos would be fatally undermined. Without Mickey's testimony, the Bonannos can be seen as simply concerned friends, attempting to stop their friend's former husband from harassing her.

Despite the fact that Mickey clung steadfastly to his version of these events during several days of very vigorous cross-examination, the court finds that his testimony lacks the faith and credibility necessary to prove the essential elements of the alleged threat. The court is simply not satisfied by Mickey's testimony alone that Joseph and Salvatore went beyond the law in trying to persuade him to stop harassing Valerie.

Initially, the court does not believe that Dalis put out a "contract" for Mickey's life, as Mickey testified the Bonannos told him. It strikes the court as implausible that the $500 debt Mickey owed to the Garden City played a significant role in any dispute between Mickey, the Bonannos, and Dalis. It is clear to the court that Valerie, and more precisely the relationships between Valerie and Dalis, Valerie and the Bonannos, and Valerie and Mickey, were the motivating factors behind whatever was said to Mickey. Of course the Bonannos could have used Dalis' name without his knowledge or involvement telling Mickey that Dalis had a "contract" on Mickey's life. Whether or not his name was so invoked, the court believes that Dalis was not personally involved with the Bonannos, Mickey, or their disagreements. In short, the court finds Dalis a truthful witness.

Sometime before the incidents of the 30th, Mickey had threatened to "ruin" Dalis, and to get Valerie and everyone close to her. Whether his testimony regarding the January 30th meeting is simply the vehicle

by which Ferreira sought to carry out these threats is far from clear, but he would only have had to exaggerate the truth slightly, and the court believes he did exaggerate it, in order to make these serious allegations against the Bonannos.

In general, Mickey Ferreira does not have a good reputation for telling the truth. Valerie testified that, "His lies have gotten him everything he's gotten. How he has gotten away with them, I don't know." Kirk Speer, who has known Mickey since they were in high school, described him as a "con man," and "too good of an actor" for someone else to know if he is telling the truth or not. Of course, both of these statements must be discounted somewhat because neither of these persons remains on friendly terms with Ferreira. However, Mickey himself admitted on cross-examination that it had been his policy always to take care of himself first and that he had earlier "prevaricated" in making statements to a reporter about the incidents at issue in this proceeding.

The reliability of Mickey's account is cast much further in doubt by his attempts to cooperate with the police in order to help reduce the numerous criminal charges pending against him. On January 18, 1978, already on bail for two state offenses and one federal offense, Mickey was arrested and subsequently charged with five additional serious felonies, including assault with a deadly weapon. Interviewed after his arrest, he told the San Jose police officers, "I got a lot of heat on me and I'll talk to anybody you guys want. . . . I want to cooperate here because I want cooperation back. . . ." Ferreira also admittedly desired to "wheel and deal" with the police as much as possible, not only to get his bail reduced,[6] but also to obtain a reduction of some of the pending state charges. On the other hand, Mickey was told, and a deputy district attorney so testified, that there would be "no deals" or reductions in any of the pending charges.

Mickey clearly told the police everything he knew about the Bonannos, and possibly more than he knew. On February 6, he went back to the police with his account of the January 30th threat, and agreed to make recorded phone calls to collaborate his account. On these facts, the court believes there is at least a reasonable suspicion that Mickey, despite being warned there would be no deals made, would nevertheless exaggerate the truth in order to tell police what they wanted to hear, believing it could only assist him with regard to the charges pending against him.

■ In conclusion, and for all the foregoing reasons, the court is not satisfied on the basis of Michael (Mickey) Ferreira's testimony that either Joseph or Salvatore Bonanno violated their conditions of probation by threatening him.

## II. ASSOCIATIONS WITH OTHER THAN LAW–ABIDING PERSONS

Both Joseph and Salvatore Bonanno are charged in several allegations with associations with other than law-abiding persons in violation of the conditions of their probation. Salvatore and Joseph are each charged with associating with "convicted felon" Phil Bell on a number of occasions during 1976 and 1977, and with "convicted felon" Michael Dorn on two occasions each during 1976. Salvatore is also charged with a March, 1976, association with Frank Sacco, "an at-large prison escapee and convicted felon," and with July 10 and 11, 1974, associations with felons Pete Tenner and Joe Sica at a restaurant in Los Angeles.

■ An "association" within the context of parole or probation conditions must be more than an incidental contact. *United States v. Albanese*, 554 F.2d 543, 546 n. 5 (2d Cir. 1977), *citing Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972). *See also Arciniega v. Freeman*, 404 U.S. 4, 5, 92 S.Ct. 22, 30 L.Ed.2d 126 (1971) ("association" in parole condition did not extend to "inciden-

---

**6.** The San Jose Police Department did assist Ferreira in having bail reduced from $50,000 to $5,000.

tal contacts" on a legitimate job for a common employer).

One allegation can be quickly disposed of on the basis of this rule. The only evidence of Salvatore's encounter with Frank Sacco is based on Salvatore's conversation with two probation officers a few days later. On the basis of the testimony of the probation officers that there was only a brief "casual conversation" in a restaurant, and that the encounter was reported to them by Salvatore, this court finds that there is insufficient evidence to sustain allegation No. 5 against Salvatore Bonanno, the alleged association with Sacco, and it is hereby dismissed.

The remaining allegations of associations with non law-abiding persons require closer analysis.

### A. Status of Bell and Dorn

Phil Bell was apparently an employee of the U.S. Mattress and Furniture Company, a corporation with which both Joseph and Salvatore Bonanno were affiliated, and which was owned by Joseph's wife, Karen, and Salvatore's son, who was then 18 years old. Michael Dorn was seen by a probation officer on two occasions at the mattress company in the presence of the Bonannos. Furthermore, he is the owner of the house presently rented by Joseph and also of an automobile formerly driven by Salvatore on a regular basis. Assuming these connections among Bell, Dorn and the Bonannos were "associations" and not mere incidental contacts,[7] the probationers nevertheless argue that (1) Bell and Dorn are not convicted felons because the jurisdiction in which they had been convicted considers the offenses for which they were convicted to be misdemeanors and, furthermore, has since "expunged" the conviction; and (2) the condition of probation required only that the

probationers "associate only with law-abiding persons," and there is no evidence that Dorn and Bell were not law-abiding at the time of the associations.

The evidence reveals that Bell's 1965 state court conviction under Cal.Penal Code § 484 (grand theft) and Dorn's 1964 conviction under the same section were "cleared" from their records pursuant to Cal.Penal Code § 1203.4 in 1967, at which time the Superior Court also granted their motions under Cal.Penal Code § 17, declaring the offenses to be misdemeanors.

Even though the offense might be considered a misdemeanor under California law, Cal.Penal Code § 17,[8] the federal definition of felony is normally controlling for the purposes of federal law. *United States v. Houston*, 547 F.2d 104 (9th Cir. 1976) (definition of 18 U.S.C. App. § 1202, not state law, governs). Looking to 18 U.S.C. § 1, we find that the federal definition of felony considers only the maximum sentence of imprisonment by which an offense is punishable, and not the sentence actually imposed. The maximum sentence for a violation of Cal.Penal Code § 484 is more than one year, which puts the offense in the felony category under the federal definition.

More uncertain, however, is the status in federal court of state convictions that have been cleared from the defendant's record by a state rehabilitation statute.[9] Although state relief from convictions has been held by the Ninth Circuit to be ineffective for federal purposes in the context of deportation proceedings under 8 U.S.C. § 1251, *de la Cruz-Martinez v. Immigration and Naturalization Service*, 404 F.2d 1198 (9th Cir. 1968), *cert. denied*, 394 U.S. 955, 89 S.Ct. 1291, 22 L.Ed.2d 491 (1969); *Brownrigg v. Immigration and Naturalization Service*,

---

**7.** We need not reach this question because of our decision herein regarding the meaning of "law-abiding persons."

**8.** *But see Barbosa v. Wilson*, 385 F.2d 319 (9th Cir. 1967), holding that for certain California statutes, notwithstanding the operation of Cal. Penal Code § 17, the potential punishment and

not the actual punishment is relevant in classifying the offense as a felony or misdemeanor.

**9.** *See* Schaefer, *The Use of Expunged Convictions in Federal Courts*, 35 Fed.B.J. 107 (1976); Note, *The Effect of State Conviction Relief on Federal Deportation Law*, 29 Maine L.Rev. 112 (1977).

356 F.2d 877 (9th Cir. 1966); *Garcia-Gonzales v. Immigration and Naturalization Service*, 344 F.2d 804, *cert. denied*, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965), and prosecutions for possession of firearms by felons, *United States v. Locke*, 542 F.2d 800 (9th Cir. 1976); *United States v. Potts*, 528 F.2d 883 (9th Cir. 1975) (en banc), the question has not been considered for the purposes of a probation or parole revocation proceeding.

California Penal Code § 1203.4, at issue here, and the other state statutes discussed in the above-cited cases are not true expungement statutes, for they do not provide for the complete erasure of the conviction even as a matter of state law. While using the language that persons convicted are "released from all penalties and disabilities resulting from the offense for which [they] have been convicted," these statutes nonetheless expressly allow the conviction to be pleaded and proved in a subsequent prosecution for any offense and do not allow the defendant to possess firearms. In addition, state courts have held that the "suspension or revocation of a license to practice a profession is not a penalty or disability within the purview of § 1203.4 of the [Cal.] Penal Code." *Ready v. Grady*, 243 Cal.App.2d

113, 116, 52 Cal.Rptr. 303 (1966). *See also People v. Wiedersperg*, 44 Cal.App.3d 550, 553–54, 118 Cal.Rptr. 755 (1975).

Furthermore, for federal purposes the degree to which a federal statute incorporates a state's law is a question of federal statutory construction: the "niceties and nuances of state law on the subject of conviction" are irrelevant. *Garcia-Gonzales, supra,* 344 F.2d at 807, *quoting Adams v. United States*, 299 F.2d 327 (9th Cir. 1962); *Arrellano-Flores v. Hoy*, 262 F.2d 667 (9th Cir. 1958). *See also United States v. Potts*, 558 F.2d 883, 887 (9th Cir. 1975) (Sneed, J. concurring).[10] In light of the above decisions, this court feels bound to conclude that for the purposes of federal law, Bell and Dorn were convicted felons whose convictions had not been expunged or set aside.[11]

While such convicted felon status might be sufficient to constitute a violation of the usual condition of *parole* that parolees not associate with persons with "criminal records," [12] it does not resolve the question of whether Bell and Dorn were "law-abiding persons" within the meaning of Joseph and Salvatore's conditions of proba-

---

**10.** These Ninth Circuit cases leave open the question of the effect to be given a federal statute that provides for complete expungement of the conviction. Other circuits have held that the Federal Youth Corrections Act, 18 U.S.C. § 5021 has this effect. *See Mestre-Morera v. Immigration and Naturalization Service*, 462 F.2d 1030 (1st Cir. 1972); *Tatum v. United States*, 114 U.S.App.D.C. 49, 310 F.2d 854 (1962); *United States v. Fryer*, 402 F.Supp. 831 (N.D.Ohio 1975); *United States v. Glasgow*, 389 F.Supp. 217 (D.D.C.1975). *But see United States v. McMains*, 540 F.2d 387 (8th Cir. 1976); *Fite v. Retail Credit Co.*, 386 F.Supp. 1045 (D.Mont.1975), *aff'd*, 537 F.2d (9th Cir. 1976). One case gave a petitioner who had been convicted and relieved under state law the more beneficial effects of the Federal Youth Corrections Act's expunction provision, 18 U.S.C. § 5021, under which the defendant could have been sentenced had the charge been filed in federal court. *Rehman v. Immigration and Naturalization Service*, 544 F.2d 71 (2d Cir. 1976). Contra, *Kolois v. Immigration and Naturalization Service*, 532 F.2d 786 (1st Cir. 1976). *See also* Note, *Expungement of Criminal Records Under the Federal Youth Corrections Act*, 62 Iowa L.Rev. 547 (1976); Schaefer,

*The Federal Youth Corrections Act; the Purposes and Uses of Vacating the Conviction*, 39 Fed.Probation 31 (Sept. 1975); Gough, *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status*, 1966 Wash.U.L.Q. 147.

**11.** The court recognizes that this conclusion could possibly lead to an unfair result in the case of probationers who conscientiously ask a person they come into contact with if that individual is a convicted felon, and the person answers "no," based on a good faith interpretation of a state statute similar to Cal.Penal Code § 1203.4. Under this court's analysis, it would be possible for probationers to violate the associational condition of probation (or parole) under these circumstances, as explained below, only if the probation officer had expressly advised the probationers that "cleared" convictions were still convictions for the purpose of the applicable conditions.

**12.** "Criminal record" has been defined to mean at least a conviction. *Birzon v. King, supra*, 469 F.2d at 1243.

tion. The most complete discussion of the distinction between the "criminal record" and the "law-abiding" conditions was set out in *United States v. Albanese, supra*:

> The words on their face, however, appear to involve quite different, albeit frequently overlapping, categories of persons. A person disobeying the law today and hence not being law-abiding may as yet have no criminal record, and a person with a past record may be entirely law-abiding today.

554 F.2d at 546. In upholding the constitutionality of the "law-abiding" probation condition against attacks of vagueness and overbreadth, the Second Circuit in *Albanese* found it unnecessary to distinguish between these parole and probation conditions. The court upheld the revocation of probation of a defendant who had "continually and consistently, over a period of years, associated on more than a casual basis with a large number of convicted criminals, many of whom had been convicted of several crimes." *Albanese, supra*, at 546. However, in the case now before us, it is necessary to determine more precisely the meaning of "law-abiding persons."

In *United States v. Dane*, 570 F.2d 840 (9th Cir. 1977), the Ninth Circuit clarified somewhat the standards applicable to probation conditions and revocations of probation:

> It is an essential component of due process that individuals be given fair warning of those acts which may lead to a loss of liberty. [Citations omitted.] This is no less true whether the loss of liberty arises from a criminal conviction or the revocation of probation. *Cf. Gagnon v. Scarpelli, supra*, 411 U.S. 778, 93 S.Ct. 1756.

*Dane, supra*, at 843.

The court further held that "where the proscribed acts are not criminal, due process mandates that the petitioner cannot be subjected to a forfeiture of his liberty for those acts unless he is given prior fair warning." *Dane, supra*, at 844, *citing Tiitsman v. Black*, 536 F.2d 678 (6th Cir. 1976). Even as to the standard conditions of probation, it must be shown that the probationer was informed that certain obligations were conditions of his probation before the probation can be revoked for failing to meet those duties. *United States v. Foster*, 500 F.2d 1241 (9th Cir. 1974).

Among the standard conditions of probation are several conditions that require further definition by the court or the probation officer.[13] Within the condition here at issue, "You shall associate only with law-abiding persons . . . ," the court or probation officer has wide discretion to determine exactly what will be required of the probationer. *Morrissey v. Brewer, supra*, 408 U.S. at 479, 92 S.Ct. 2593, at 2599, 33 L.Ed.2d 284 ("The broad discretion accorded the parole officer is also inherent in some of the quite vague conditions, such as the typical requirement that the parolee avoid 'undesirable' associations or correspondence.") *citing Arciniega v. Freeman, supra*, 404 U.S. 4, 92 S.Ct. 22, 30 L.Ed.2d 126; *United States v. Pierce*, 561 F.2d 735 (9th Cir. 1977); *United States v. Consuelo-Gonzales*, 521 F.2d 259 (9th Cir. 1975) (en banc).

In explaining the "law-abiding persons" condition to the probationer, the probation officer ideally should specify the class of persons with whom the probationer may not associate. This class, which should be reasonably related to the purposes of probation, might include persons who have been convicted of any criminal offense or only those convicted of certain offenses, or it might include persons who have been convicted at any time, or only those convicted within a certain number of years. The prohibited class could also include persons

---

**13.** *See* conditions (6) & (7), among others listed *supra*, n. 3. While imposition of the conditions of probation is the duty of the sentencing judge, *United States v. Dane, supra*, 570 F.2d at 846 (dissenting opinion) *citing United States v. Crocker*, 435 F.2d 601 (8th Cir. 1971); *White-*head v. *United States*, 155 F.2d 460, 462 (6th Cir.), *cert. denied*, 329 U.S. 747, 67 S.Ct. 66, 91 L.Ed. 644 (1946), the probation officer implements these conditions by giving further explanations and instructions to the probationer. *See also* 18 U.S.C. §§ 3651, 3655.

encountered in certain employment, social,[14] or other situations.[15] But in the absence of such an explicit explanation,[16] it would be altogether unfair to hold the probationer to the broadest possible interpretation of this condition.

■ The "law-abiding persons" condition of probation, by its words alone, can be construed plainly to prohibit only associations with persons who are engaging in criminal activities at or around the time of the association.[17] Without additional expla-

nation and specification from the probation officer, we think that a probationer has "prior fair warning" only that associations with such presently non law-abiding persons would constitute violations of the condition.[18]

In the case now before us, it thus becomes important to determine whether this limited definition of the condition alone was applicable to probationers Joseph and Salvatore Bonanno during the relevant periods, or whether their probation officers had

14. *See Malone v. United States*, 502 F.2d 554 (9th Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 809, 42 L.Ed.2d 824 (1974).

15. The trend is towards greater specificity in the conditions of probation. The Advisory Committee on Criminal Rules of the Judicial Conference, in the note to the proposed amendment of Rule 32(g) of the Federal Rules of Criminal Procedure, endorses the American Bar Association recommendation that probationers should have the right to apply to the court for a clarification or change in the conditions of probation. *See* ABA, Standards Relating to Probation § 3.1(c) (Approved Draft, 1970). The Committee reasoned that:

"(1) the probationer should be able to obtain resolution of a dispute over an ambiguous term or the meaning of a condition without first having to violate it; and (2) in cases of neglect, overwork, or simply unreasonableness on the part of the probation officer, the probationer should have recourse to the sentencing court when a condition needs clarification or modification."

The ABA Standards also recommend, in § 3.2(c): "Conditions may appropriately deal with matters such as the following: . . . (vii) refraining from consorting with certain types of people or frequenting certain types of places."

S.1437, which passed the Senate in the 95th Congress, 2nd Session, provides for even greater specificity. Chapter 21, Probation, § 2103 "Conditions of Probation," states that the court may provide that the probationer . . . (b)(7) "refrain from frequenting specified kinds of places or from associating unnecessarily with specified persons." Subsection (d) further provides: "The court shall direct that the probation officer provide to a defendant sentenced to probation a written statement setting forth all the conditions to which the sentence is subject with sufficient clarity and specificity to serve as a guide for the defendant's conduct and for such supervision as is required." Senate Report No. 95–605, Part I, accompanying S.1437, at 905, emphasizes that the discretionary conditions of § 2103, and in particular, the associational condition, "would have to be tai-

lored to the particular circumstances of the defendant." Both the ABA Standards and S.1437 provide that the court should set the conditions of probation individually for each probationer. ABA Standards, *supra*, § 3.1(a) & (b), S.1437, § 2103(a), (b) & (c).

16. The Supreme Court, in striking down the associational parole violation in *Arciniega v. Freeman*, *supra*, 404 U.S. 4, 92 S.Ct. 22, stated that "[the] Parole Board has wide authority to set conditions," and indicated that more specific guidelines from the Board could have prohibited the type of contacts there at issue. However, "absent a clear Parole Board directive," the Court found that incidental occupational contacts were not precluded. 404 U.S. 4, 92 S.Ct. 22.

17. Webster's Third International Dictionary (1971), defines "law-abiding" as "obedient to the law." The Oxford English Dictionary (Compact Edition 1971), defines the phrase to mean "maintaining or submitting to the law." "Abiding," the present participle of the verb "abide," indicates a present or ongoing condition.

18. The probationer can be held strictly accountable for such contacts. Thus, a probationer who associates with a person who is later shown to have been involved in criminal activity at the time of the association, has committed a *prima facie* violation of the condition of probation. *See Frank v. United States*, 395 U.S. 147, 154, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969) (upholding the imposition of five years probation for criminal contempt, a petty offense). In their dissenting opinion, Justices Warren and Douglas discussed the probationary powers of a court:

Finally, a court can order a defendant to associate only with "law-abiding" persons, thereby significantly limiting his freedom of association, for this condition which does not limit revocation of probation to "knowing association," forces him to choose his acquaintances at his peril.

395 U.S. at 154, 89 S.Ct. at 1508.

further specified the meaning of the "law-abiding persons" restriction, and thereby imposed additional restraints on their associations.

### B. *Joseph's Associations with Bell and Dorn*

 One probation officer testified that the U.S. Probation Office does not have a general policy as to what a probationer is told as to the meaning of "law-abiding persons." The standard applicable to Joseph was set after his release from prison when he reported to Probation Officer Mowl on November 3, 1975, and signed the conditions of probation. Officer Mowl testified that he read the law-abiding condition to Joseph and asked him if he had any questions about it. The plain terms of the associational condition apparently were not further specified by Officer Mowl or any other probation officer prior to the associations herein alleged. Nor was there any evidence as to the conduct of Dorn and Bell, besides the evidence that each had a prior felony conviction, that would indicate that they were other than law-abiding persons. The court concludes that on the basis of the limited explanations given to him, Joseph did not have adequate prior fair warning that associations with persons who had been convicted more than 12 years before were prohibited associations within the condition of probation. Thus, the court holds that these associations were not violations of the associational condition of probation as explained to Joseph.

### C. *Salvatore's Associations with Sica and Tenner*

With respect to Salvatore Bonanno, the evidence reveals that a more detailed explanation of the conditions of probation was given to him by Probation Officer Paul Chandler. At the time of his release on March 8, 1974 from a prison sentence imposed in an unrelated federal case, Salvatore was on "mandatory release," which for our purposes, is the same as and will be referred to as parole. 18 U.S.C. §§ 4163 (discharge of prisoner), 4164 (released prisoner as parolee). *Tippitt v. United States Board of Parole*, 446 F.2d 26, 27 (6th Cir. 1971); *Humphrey v. United States Board of Parole*, 438 F.2d 1214, 1215 (3rd Cir. 1971); *Sargis v. United States Board of Parole*, 391 F.Supp. 362, 365–66 (E.D.Missouri 1975); *Godoy v. United States Board of Parole*, 345 F.Supp. 1292, 1294 (C.D.Cal.1972).

Officer Chandler was Salvatore's supervising officer for both probation and parole, which, pursuant to the sentence of this court in 1972, ran concurrently until September 10, 1975, when the parole terminated. It was during the period of dual probation and parole that Salvatore's associations with Tenner and Sica,[19] allegations Nos. 3 and 4 of the petition, are alleged to have taken place.

At the time of the July 10 and 11, 1974, encounters with Tenner and Sica, Salvatore had been instructed that the standard conditions of parole would apply to him in his status as both parolee and probationer.[20] As explained by Officer Chandler, the two parole conditions regarding associations were "not associating with anybody with a

---

**19.** Although some conditions of parole may differ from the standard conditions of probation, the condition of probation here at issue is clearly consistent with the two conditions of parole explained to the probationer. These conditions of parole are: (6) ". . . Nor shall you associate with persons engaged in criminal activity. . . . (10) You shall not associate with persons who have a criminal record unless you have permission of your probation officer."

When Salvatore Bonanno's parole terminated and the conditions of probation were signed on September 10, 1975, Officer Chandler testified that there was only a slight difference in the applicable conditions: "I think the only distinc-

tion that was discussed at that time was the fact that inasmuch as he was no longer on mandatory release and was now singularly on probation, that any travel permission could be granted by the probation office, rather than going to the parole commission authority."

**20.** Sica was paroled in October, 1973, from prison following a 1964 conviction for violation of 18 U.S.C. § 371 & § 875(b). He also had previous convictions for violation of 18 U.S.C. § 1951, *et seq.*, the Anti-Racketeering Act. Tenner was convicted in 1964 of violating 18 U.S.C. §§ 2 & 1343, and also had prior felony convictions in state court.

prior criminal history unless granted permission by the Probation Officer to do so; and the other is not to associate with people involved in illegal activities."

Mr. Chandler testified that he had discussed with Salvatore prior to July, 1974, what would be an appropriate response in the event Salvatore ran into individuals of past acquaintance with whom he was prohibited from associating. A brief, casual and unplanned contact would be permissible, Officer Chandler testified he had explained, so long as it was reported to the probation office. A longer encounter, which would be prohibited, would also have to be reported.

The uncontradicted testimony of Sergeant Charles Wilson of the Los Angeles Police Department was that Sergeant Wilson observed Salvatore Bonanno seated at a table in the dining room of a restaurant in Los Angeles with Joe Sica and Pete Tenner from approximately 10:00 p. m. on July 10, 1974, until 1 or 1:30 a. m. the following morning, July 11. Counsel for the probationers' suggested that Tenner and Sica were simply attending the same business meeting with Salvatore in Los Angeles. But both Sergeant Wilson and Officer Chandler testified that they did not have knowledge of any such business affiliation, nor was there any evidence to that effect introduced. Officer Chandler was very specific in his recollection that, although Salvatore mentioned the names of business representatives of the two companies he met with at the meeting, the name of Joe Sica, with which Officer Chandler was familiar, was not disclosed until brought up at a later time by Officer Chandler.

■■■ Based on this evidence, the court finds that the failure of Salvatore Bonanno

to report the encounters with Tenner and Sica was in itself a violation of the clearly explained conditions of probation. The court further finds that the nature and duration of the encounters make them associations that were prohibited by the terms of probation, rather than mere casual contacts.

### D. Salvatore's Associations with Bell and Dorn

On July 1, 1976, after a three or four month period of joint supervision by Officers Mowl and Chandler, Officer Mowl assumed the sole supervision of Salvatore Bonanno, who by then was on probation exclusively. As discussed above, Officer Mowl was also the supervising probation officer for Joseph Bonanno from November, 1975, until February, 1978.

■■■ There is nothing in the record to indicate what explanations, if any, Officer Mowl made to Salvatore concerning the condition of probation regarding law-abiding persons. Each probation officer, within his discretion, may define the associational condition differently.[21] Similarly, as Officer Mowl explained at the hearing, each probation officer may define policies regarding announced or unannounced home and/or business visits to probationers, telephone contacts, and many other instructions given to probationers. On the evidence now before this court, we can assume at the most only that Officer Mowl discussed the law abiding persons condition with Salvatore in the same manner as he discussed it with Joseph. Thus, the court finds that at the time of the associations with Bell and Dorn, Salvatore, like Joseph can be held only to an interpretation of the condition restricting him from associating with persons presently or very recently engaged in

---

**21.** The probation officer who assumed the supervision of Joseph and Salvatore in February, 1978, testified that he "reviewed" the conditions of probation with Salvatore upon assuming supervision. It is at this initial contact meeting that each probation officer should clarify, preferably in writing, exactly what is expected of the probationer, specifically including what types of associations are prohibited. This officer testified that he read the "law-abiding

persons" condition to Salvatore, verbatim. The only additional explanation was Salvatore's statement that if he ran into someone he knew, who had a criminal record, he would acknowledge him and shake his hand. "He said if it was just a casual conversation, he would simply acknowledge the person's presence. He didn't go into any detail beyond that."

non law-abiding activities. Consequently, the court concludes that the government has failed to show a violation of allegations Nos. 2 and 6 against Salvatore.

## III. INCOME

Allegation No. 9 against Salvatore Bonanno and allegation No. 4 against Joseph charge that each probationer "failed to accurately fill out his monthly report forms regarding income." The court regards these as serious charges that bear upon the probationer's attitude toward both the court and the probation office, and as affecting the probation officers' ability to design and carry out the appropriate probationary supervision.

At the hearing, two boxes on the probationers' monthly report forms were the foci of the inquiry into "income," as it was defined on the report forms.[22] The "earnings box" asks, "What was the total amount you earned from employment during the month before deductions?" The "additional income box" asks, "Did you receive any money other than from employment, such as loans, relief benefits, etc. If so, give amounts and from whom received."

For many of the months during their probationary periods, both Bonannos simply failed to make any notation in these two boxes; and when they did respond, only sporadically did they place numbers in the boxes. Probation Officer George Mowl testified that on September 11, 1976, he pointed out to Salvatore and his attorney, Albert Kreiger, that he had a question regarding Salvatore's monthly income, and, referring to the monthly reports, he "would like to see something down there." Officer Mowl also testified that he "would like to have known what he [Joseph] was making," and to have the earnings box completed, although he had never called the blanks to Joseph's attention. Officer Mowl, who supervised both Joseph and Salvatore, testified that the monthly forms were required to facilitate supervision. He further stated

that a blank in the earnings or additional income box indicated to him that there was nothing for that month in that category, "but I had no way of knowing." The government initially took the position that the Bonannos' failure to either place a number in the boxes or write the word "none" was in itself a violation of the terms of their probation.

██ However, during the hearing the court stated its position that failing to fill in the boxes by itself did not constitute a violation of the conditions of probation. In the court's view, to prove the charged violation it is necessary also to show that there was indeed income during that period which was not properly reported. Subsequently, the government introduced a substantial amount of evidence as to the Bonannos life-style and actual income, including some of their federal income tax returns and various loan applications, promissory notes, and cancelled checks. After reviewing this evidence, and comparing these indications of income and loans received by the Bonannos with their monthly report forms, this court finds that both probationers intentionally and continually reported their incomes inaccurately to the probation office and did not seriously attempt to fulfill this requirement of their probation.

### A. Salvatore

On his 1975 federal income tax return, Salvatore Bonanno reported no income from wages and $3,000 in "other income" from two college campus lectures at $1,500 apiece. He thus claimed a total income of $3,000. However, on his monthly report forms for the same year, Salvatore reported $4,200 in earnings, including four months when the earnings box was left completely blank, one month when a horizontal line was drawn through the box, and one month for which the report form is unavailable. (It is stipulated at the hearing that the unavailability of certain monthly report forms was not the fault of the probation-

---

**22.** There was some evidence indicating that Salvatore's and Joseph's indebtedness, which was to be reported in another box, was also

inaccurately reported. Since this was not specifically alleged by the government, it will not be considered herein.

ers.) Thus in 1975, Salvatore overstated his income to the probation office by almost 50%, as compared to what he reported to the Internal Revenue Service.

For 1974, Salvatore's W–2 Wage and Tax Statement submitted with his tax return showed $8,500 as his total wages, and he also reported jointly with his wife an additional $2,050 in "other income" for that year. During the same period, he reported to the probation office a total of $11,000 in salary between March and August, 1974, from the same employer listed on his W–2 form. In September, he reported $2,374 in lecture fees, for two months he wrote "none" in the earnings box, and for one month he left the box blank. So neither the wages nor "other income" figures reported to the probation office match the amounts reported to the IRS.

Also in 1974, Salvatore's monthly report covering the month of May stated in the income box that Salvatore had received (or was about to receive) $700 in lecture fees. However, a promissory note and previous testimony by Salvatore in a bankruptcy proceeding, show that on May 24, 1974, Salvatore received $5,000 from Style Homes, Inc. This loan was neither reported on the monthly probation report for May nor for subsequent months.

For the year 1977, the government produced a bill for $4,500 to a customer of Los Gatos Construction Co., now Kachina Enterprises, Inc., and the customer's payment in the form of a check made out to "cash" for $4,500. The check was endorsed and cashed by Salvatore on June 3, 1977. There is no corresponding deposit for $4,500 or more in the June or July bank statements of the construction company, so apparently, the money did not go to the construction company. However, although the court believes it is likely that the funds went to Salvatore and most probably were not reported, the monthly report from Salvatore for June, 1977, is one of those which is unavailable.

B. *Joseph*

The total wage income that Joseph and his wife reported on their joint 1976 federal tax return was $3,475, of which only $900 was earned by Joseph. From the same employer in the same year, Joseph listed earnings for three months totaling $2,700 on his monthly reports, with the word "commission," but no dollar figure, written in the earnings box for four additional months. The earnings box was left completely blank for three months that year, and the report form for one month is unavailable. Thus Joseph overstated his 1976 income to the probation office by some 300%.

Many of the financial affairs of Joseph are more difficult to decipher because his personal finances are consistently intertwined with those of the corporate entities with which he is affiliated. For example, testimony at the hearing revealed that during 1977, Joseph purchased jewelry, both on a charge account and for cash, from a local jeweler. After subtracting a $200 payment, the balance due on the account for a diamond and lapis ring, a jade ring, two gold bracelets, a diamond and jade ring, and a diamond pendant totaled $1,845 as of March 7, 1977. On that same day, Joseph ordered a diamond and gold initial ring with a cash price of $1,959. Subsequently, he returned one ring, receiving $95 credit, and on June 15, 1977, he paid the jeweler $1,000 on his account with a check drawn on Kachina Enterprises. Since that time, no further payments have been made and the present balance on the charge account is $650, while $1,959 is still owed for the ring. There is nothing in the record to indicate that any of this jewelry was purchased for use in any of the businesses in which Joseph has an interest, and the jeweler testified that it was his belief that the jewelry was all bought for personal use. Whether the $1,000 company check which was used to make the payment on Joseph's personal charge account at the jewelers was listed as earnings or a loan on the June, 1977, reporting form cannot be determined because that form is unavailable. However, the indebtedness to the jeweler has never been reported, although it was all incurred in early 1977.

More recent transactions also show the same disregard for reporting requirements. The government introduced the personal check of A. J. Insana, dated January 27, 1978, payable to Joseph Bonanno in the amount of $3,600. A bank teller from the Bank of America in Los Gatos testified that she cashed this check for Joseph at about this time. Joseph does not have a personal checking account at that bank, and the check later was returned because of insufficient funds. Since then, $900 has been repaid the bank. However, the $3,600 was not reported by Joseph as either earnings or additional income on his January or February, 1978 reports, and the approximately $2,700 he owes the bank has not been reported as a debt.

The government introduced documents indicating that in April of 1977, Joseph purchased a 1963 Bentley automobile for $14,910, with a cash down payment of $5,260. On the credit application regarding the automobile, he listed his income as $5,000 per month as the president of Kachina Fashions, Inc. Although his wife Karen testified at the hearing that both the 1978 Porsche Carrera Joseph currently drives and the Bentley are owned by Kachina Enterprises, the sales agreement, credit application, and certificate of insurance for the Bentley all indicate that Joseph at least initially purchased this automobile in his own name. No documentation of ownership was introduced concerning the Porsche or the 1978 Cadillac Seville, currently driven by Karen Bonanno, which she testified she is paying for with her own funds.

In sum, the discrepancies between the figures on the monthly report forms, and the loans and income, that are indicated by documents introduced in this proceeding have convinced this court that throughout their probationary supervision, Joseph and Salvatore have maintained a cavalier attitude towards reporting their monthly income and earnings, and have failed to do so accurately. The same practices have been followed with regard to their debts, which were tangentially at issue here. In all their financial reporting to the probation office, they appear to have entered dollar amounts almost randomly each month, sometimes overstating, sometimes understating what the court can determine of their actual incomes. On other occasions, they apparently hoped that writing the word "none," drawing a line, or leaving a blank space would satisfy the probation office.

The monthly report forms are an important tool for the probation officer in supervising probationers. In the event of a revocation proceeding, the reports can also be evidence of the probationer's good faith and honest efforts to find and keep gainful employment, maintain sound financial dealings, and cooperate with the probation office. In this case, however, the reports indicate just the opposite, and make it clear that neither Joseph nor Salvatore has treated the monthly reports in the serious manner which is required of them.

In particular Salvatore's self-selected determinations about what information should be reported to the probation office is of concern to the court in evaluating his adherence to the conditions of probation. For example, Salvatore received the required advance travel authorization before his July, 1974 trip to Los Angeles, and after his return, reported to Officer Chandler that he had been questioned by the police while in Los Angeles. However, Salvatore failed to mention his associations with Tenner and Sica. When Officer Chandler brought the meeting with Sica to Salvatore's attention, Salvatore admitted that he had a casual, social contact with Sica but still failed to mention that he had also met with Tenner. Similarly, Salvatore reported only some of his earnings and loans, and gave a variety of responses which might have been interpreted to mean that he had no income for certain months. Such partial and elusive compliance with the conditions of probation is altogether inadequate.

■ Some of the income reporting discrepancies discussed above occurred several years ago. However, it is not necessary for the probation office to instigate a revocation proceeding immediately following a suspected violation. Instead, as the Su-

preme Court stated in *Morrissey v. Brewer, supra*, 408 U.S. at 479, 92 S.Ct. 2593, the parole or probation office can wait to assess the cumulative effect of the suspected violations before initiating revocation proceedings.

Therefore, the court finds that on the basis of the cumulative and repeated failure of both Joseph and Salvatore Bonanno to file accurate reports of their income on their monthly report forms, both Bonannos are in violation of the terms of their probation.

The second step of the probation revocation proceeding, the determination of whether probation should be revoked and the defendants resentenced to prison, will be determined at a hearing in San Jose on June 2, 1978, at 9:30 a. m.